[Civ. No. 8793.   Third Dist.   May 8, 1956.]

FRED WAGNER et al., Respondents, v. TROY McCONNELL et al., Appellants.

Stokes & Rader for Appellants.

L. C. Smith and L. W. Pitman for Respondents.

VAN DYKE, P. J.—This is an appeal from a judgment in favor of the plaintiffs in an action brought to specifically enforce appellants' agreement to purchase real property. On January 10, 1952, the parties executed a California Real Estate Association Standard Form of "Deposit Receipt" by which respondents acknowledged receipt of $500 from appellants as:

". . . [D]eposit account purchase of the property, situated in the County of Shasta, State of California, described as follows, to-wit: Two bedroom home in Buckeye, belonging to Mrs. Fred Wagner, Listing #H-691 at the purchase price of SIX THOUSAND, FIVE HUNDRED AND No/100 ($6,500.00) Dollars. The balance of said purchase price is to be paid at the rate of $60.00 per month or more including 6% interest. Total down payment $1500.00.

. . . . . . . . . . . . . . . .

"That the evidence of the title shall be (a) Title Insurance issued by a responsible title company to be furnished and paid for by the (b) 50-50 Buyer and Seller. Should the title to said property prove defective or unmerchantable and should the seller be unable to perfect same within a reasonable time from the date hereof all amounts paid hereon shall be returned to the purchaser unless the purchaser elects to accept the title in said condition."

It is at once apparent that the contract as evidenced by the deposit receipt wanted something of clarity insofar as a description of the subject property be concerned, for from the face of the contract the property could not be located on the ground. However, it appeared without dispute that the sellers, hereinafter called respondents, had owned a parcel of property in Shasta County, in Buckeye, from which they had conveyed a portion to one Knakel; that they retained the balance which constituted a lot having an eastern boundary of 66.15 feet, a northern boundary of about 200 feet, a western boundary of 64.77 feet, and a southern boundary of approximately 200 feet; that on this remainder there was situated a two bedroom home; that they owned no other land in that vicinity. There was nothing from which it might be inferred that they were retaining any land between themselves and Knakel. This evidence clarified the description and satisfactorily fixed with sufficient certainty the subject matter of the deposit receipt. (*Carr* v. *Howell,* 154 Cal. 372 [97 P. 885] ; *Joyce* v. *Tomasini,* 168 Cal. 234 [142 P. 67].)

It further appeared without dispute that after the northerly portion of the whole property had been conveyed to Knakel and prior to the execution of the deposit receipt, Knakel had conveyed to one Dean the property he received from respondents, but in describing the same had overlapped onto respondents' property. The overlap consisted of a gore or triangle which had a base on the westerly line of respondents' property measuring 17 feet in length with sides unequal, but each approximately 100 feet long. This arose because Knakel, describing his southerly line, which was the northerly line of respondents, assumed that it went straight from the northeasterly corner of respondents' retained property to their westerly boundary. He ignored the fact that the line extended from the northwest corner 93 feet to a point and then took a different course northerly of the straight line assumed by him.

The deposit receipt provided that evidence of title should consist of title insurance issued by a responsible title company and in due course respondents ordered such insurance from the Shasta Title Insurance Company. This company, however, considered that the overlap of the Knakel deed clouded respondents' title to the extent of the overlap and hence declined to insure the title to that part of respondents' property. (Respondents' own witness, the manager of the title company, testified the title was noninsurable unless Dean's claim was relinquished.) Thereafter appellants served

notice of rescission and demanded the return of moneys paid by them, which by that time amounted to $1,620. The noticed rescission was based upon the claim that the respondents had been given a reasonable time to perfect title to the property being purchased, that the appellants had been informed by the title company that merchantable title could not be shown, and that respondents were, therefore, unable to convey by the sort of title contracted for. Respondents endeavored to clear their title from the cloud created by the overlap in the Knakel deed and finally succeeded in securing from Dean a quitclaim deed to a part of the disputed area, leaving under dispute, however, the remainder with a base line of 9.72 feet and thence continuing as a narrow triangle with sides approximately the same in length as the original gore. They then tendered to appellants a deed with the title insured, which included that part of the original gore that Dean had quitclaimed to respondents, but which excluded the rest of the disputed area. The tender was rejected and thereafter the respondents began this action by a complaint which alleged that the contract of purchase coincided with the deed they had tendered. The trial court found this allegation to be true and the first attack which appellants make upon the judgment that followed is that this finding is wholly unsupported by the evidence.

We think it apparent from the statement we have made that appellants' contention with respect to the lack of support in the record for the court's finding that the deed tendered by respondents coincided with the description in the deposit receipt must be sustained. It is quite apparent from the record that the amount of land which Dean had been persuaded to quitclaim to respondents in the effort to perfect their title represented a compromise between respondents and Dean and simply resulted in a relinquishment by Dean of a portion of the disputed area. With this compromise appellants had nothing to do; and the court erred in declaring that the area Dean quitclaimed constituted the limit of the description in the deposit receipt. There is no evidence whatever from which that result can be arrived at. The quitclaim deed from Dean was acquired after the title company had refused to insure the title and after the appellants had rescinded upon the ground that title insurance could not be obtained within a reasonable time. To tender the title contracted for respondents' deed must have included the whole area as to which they were in dispute with Dean, and which

in fact they owned. That was what appellants had agreed to buy. That was what respondents had agreed to sell. Respondents have never offered to convey to appellants that which they agreed to sell, and a fair résumé of the record is that they recognized they could not get an insurable title to offer. Therefore the judgment appealed from must be reversed.

In addition to the findings which we have hereinbefore declared to be without support in the evidence the court made various other findings of which complaint is made by the appellants. Some of these contentions are answered by what has heretofore been said and no specific mention need be made of them.

The court found that appellants were in default in the matter of progress payments when they gave notice of rescission and of their election to refuse any but the title for which they had contracted. This finding is not supported. The contract itself did not expressly fix the time when progress payments should be made. Neither did it expressly provide for possession. The buyers' instructions given to the title company apparently contained provisions which did not appear in the deposit receipt. They were to the effect that a further payment of $1,000 would be made and that for the balance of the purchase price a deed of trust providing for payments of $60 per month should be executed by the appellants, the money paid in and the note and deed of trust to be delivered when the title contracted for had been received. The respondents as sellers acquiesced in this arrangement, as is shown by the fact that when they made their tender they prepared and tendered a note and deed of trust in accordance with the buyers' escrow instructions. The buyers had deposited the extra $1,000, making a total deposit of $1,500, plus the sum of $36.50 as their share of escrow and title costs and had gone into possession of the property. Thereafter they paid in two further sums of $60 each, but made no further payments. Under the foregoing circumstances the sellers were not in position to consider the buyers in default, for not only were they acquiescing in the construction of the contract as calling for an exchange of note and deed of trust for a deed after the purchase price had been paid down to $5,000, which it had been, but they were then themselves in default in that they were not able to convey the title agreed upon. (*King* v. *Stanley*, 32 Cal.2d 584, 590 [197 P.2d 321]; *Brant* v. *Bigler*, 92 Cal.App.2d 730, 733 [208 P.2d 47];

*Katemis* v. *Westerlind,* 120 Cal.App.2d 537, 546 [261 P.2d 553].)

It is apparent that respondents cannot now specifically enforce the contract contained within the deposit receipt as construed in the light of the circumstances. They have made and completed their efforts to perform and their offer of performance did not measure up to their obligations. ██ The contract provided if they could not convey the title contracted for and unless appellants elected to take the title available then respondents were obligated to repay the money they had received. The record is clear that appellants have refused to accept the partial performance tendered and that they, therefore, pursuant to their notice of rescission and to the explicit terms of the agreement are entitled to recover the payments they have made on the purchase price. However, under principles of unjust enrichment they may be charged with value of the use of the premises, a matter which is to be decided upon further proceedings on the cross-complaint.

The judgment appealed from is reversed with instructions to the trial court to enter judgment against the respondents upon their complaint and to take such further proceedings on the cross-complaint of appellants as are consistent herewith and with such evidence as may be given in such proceedings.

Peek, J., and Schottky, J., concurred.

A petition for a rehearing was denied June 4, 1956, and respondents' petition for a hearing by the Supreme Court was denied July 5, 1956. Carter, J., was of the opinion that the petition should be granted.